## In re TIFFANY B.

Court of Appeals of Tennessee, at Nashville.

Assigned on Briefs Jan. 12, 2007.

Feb. 26, 2007.

Permission to Appeal Denied by Supreme Court April 23, 2007.

Permission to Appeal Denied by Supreme Court May 29, 2007.

Christopher W. Barber, Clarksville, Tennessee, for the appellant, Anthony G.

Merriel Bullock Neal, Clarksville, Tennessee, for the appellant, Tammy G.

Robert E. Cooper, Jr., Attorney General and Reporter, and Elizabeth C. Driver, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Gregory D. Smith, Clarksville, Tennessee, Guardian Ad Litem.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

This appeal involves the termination of the parental rights of the biological parents of a six-year-old girl. Approximately fourteen months after the emergency re-

moval of the child and her half-brother from their parents' custody, the Tennessee Department of Children's Services filed a petition in the Montgomery County Juvenile Court to terminate the parental rights of both parents. Following a hearing, the juvenile court found that both parents had willfully abandoned their daughter and had willfully failed to comply with the requirements of their daughter's permanency plans and that the conditions that warranted the original removal of the child still persisted. Therefore, the court concluded that terminating the parents' parental rights was in the child's best interests. Both parents have appealed. We have determined that the Department failed to present sufficient evidence to demonstrate clearly and convincingly that it exercised reasonable care and diligence to provide services to the parents that would have enabled the Department to reunify the family.

Tammy G. is the mother of two children. Tommy B., the son of David E., was born in December 1991. After David E. moved to Wichita, Kansas, Tammy G. gave birth to a daughter, Tiffany B. in August 2000. Anthony G. is Tiffany B.'s biological father. Apparently neither father was listed on their child's birth certificate. Tammy G. chose instead to use her maiden name as the children's surname.

Tammy G.'s and Anthony G.'s circumstances hit rock bottom in 2004. Their relationship was punctuated by domestic violence, and Anthony G. did not always reside with Tammy G. and the children.[1] Both Tammy G. and Anthony G. were addicted to crack cocaine. They were both unemployed and were committing petty crimes to obtain money to purchase drugs. Eventually, Tammy G. turned to prostitution to support her addiction. Tammy G. and the children lived in a residence with-

out electricity or running water, and Tommy B. was not attending school even though he was of school age. In early October 2004, Tammy G. placed the two children in the custody of friends because she was unable to provide for them.

The Tennessee Department of Children's Services learned about Tammy G. and the children in September 2004 after receiving a report about Tommy B.'s truancy. On October 6, 2004, the Department filed a petition in the Montgomery County Juvenile Court seeking to have Tiffany B. and Tommy B. declared to be dependent and neglected. The Department was not sure who the fathers of the two children were when it filed this petition. Its petition listed Anthony G. as both children's stepfather and David E. as their father.

The juvenile court immediately entered a protective custody order on October 6, 2004. Following a preliminary hearing on October 7, 2004, the court filed a second order on October 13, 2004, concluding that the children were dependent and neglected and placing them temporarily in the Department's custody. Anthony G. was present at the October 7, 2004 hearing, but Tammy G. was not. After several temporary placements, the Department placed both children with foster parents who lived in LaVergne.

On October 11, 2004, the Department convened a meeting to develop a permanency plan for both children. In addition to department personnel, Tammy G. was present, as was her father, and Tiffany B.'s foster-father. Neither Anthony G. nor David E. were present. The purpose of this plan was to reunify the family, and thus the plan envisioned that the parents would have at least one supervised visit each week with the children. The plan

---

1. The record does not reveal whether Anthony G. and Tammy G. were ever married.

imposed many particularized duties on Tammy G.[2] but required Anthony G. to do nothing other than contact the Department.[3] The plan did not require either Tammy G. or Anthony G. to support Tiffany B. financially. Tammy G. was informed during the meeting that the Department could institute proceedings to terminate her parental rights if she failed to accomplish the goals set out for her in the plan. The record contains no evidence that Anthony G. received a copy of this plan.

On October 18, 2004, the Department filed a motion to ratify the October 11, 2004 permanency plan. At a hearing held on November 5, 2004, the trial court appointed a guardian ad litem and lawyers for Tammy G. and Tiffany B.'s "father." The court's minutes, such as they are, indicate that Tammy G. was present at this proceeding and that Tiffany B.'s "father" was also present. However, the minutes do not reveal whether the "father" referred to in the minutes was Anthony G. or David E.[4] One week later, on November 18, 2004, the juvenile court approved Tiffany B.'s permanency plan.[5]

After the juvenile court gave the Department custody of their children, both Tammy G. and Anthony G. conceded that it would be unsafe to return the children to them because of their drug addiction.

Tammy G. and her family requested the Department to consider placing the children with her sister who was living in North Carolina at the time. The Department eventually decided against pursuing that placement after the North Carolina Department of Social Services reported that Tammy G.'s sister had been evicted from her residence and was living in a hotel room with her husband and three children.

Tammy G. also went to Bradford Health Services for an alcohol and drug assessment. However, when she was not forthcoming about her drug addiction, the counselors declined to recommend continuing counseling or therapy.

On February 11, 2005, the juvenile court held a final hearing on the Department's dependent and neglect petition. Neither Tammy G., Anthony G., nor David E. appeared; however, the court's minutes reflect the Tammy G.'s lawyer and David E.'s lawyer were present. On February 25, 2005, the court entered a final order concluding that both children were dependent and neglected and that they should remain in the Department's custody. The Department served copies of this order on Tammy G.'s lawyer and on David E.'s law-

2. The plan required Tammy G. (1) to remain drug and alcohol free, (2) to submit to an alcohol and drug assessment, (3) to submit to random drug tests, (4) to provide a safe and clean home environment, (5) to earn income sufficient to provide for herself and her children, and (6) to provide verification that she has contacted suggested agencies for housing assistance.

3. This plan identified Anthony G. as Tiffany B.'s "Legitimated Father." The record contains no evidence of a judicial proceeding establishing Tiffany B.'s parentage.

4. The juvenile judge's handwritten notations on the minutes state that "Father is David ...

[E.]." Thus, the most reasonable interpretation of the minutes is that the court believed at that time that David E. was Tiffany B.'s biological father. There is no indication in the record that the court appointed the same lawyer to represent both David E. and Anthony G. or that the court appointed a separate lawyer for Anthony G. Perhaps the court believed that Anthony G. did not need a lawyer because he had been identified only as the children's stepfather.

5. The court's minutes indicate that the Department's staff and the mother's lawyer were the only ones present at this hearing.

yer but did not serve a copy of the order on Tammy G., David E., or Anthony G.

The record contains little detail regarding the parents' efforts to maintain a relationship with their children during 2005 or the Department's efforts to maintain contact with the parents. What evidence there is indicates that the parents were not diligently pursuing a relationship with the children and that the Department was not aggressively attempting to stay in contact with the parents to provide either of them with rehabilitative services.

Neither Tammy G. nor Anthony G. had much direct contract with the children during 2005. Tammy G. talked with Tiffany B. by telephone on several occasions, but neither she nor Anthony G. sought to arrange for personal visits. Anthony G. spent the better part of 2005 in jail. When he was not incarcerated, he lived with his mother in Kentucky, with a friend, or in a transient hotel. Tammy G. was also incarcerated numerous times during 2005 and lived in two or three different places when she was not in jail. Neither Tammy G. nor Anthony G. held a steady job during 2005, and they made no effort to provide financial support for Tiffany B. or Tommy B.

The Department eventually satisfied itself that David E. was Tommy B.'s biological father. In August 2005, the Department permitted Tommy B. to move to Wichita, Kansas to live with David E. and his family. However, the Department retained legal custody of Tommy B. as a result of the earlier dependent and neglect orders.

The Department had little contact with either Tammy G. or Anthony G. during 2005. The Department blamed this on the difficulty of locating the parents and on the parents' failure to contact their case manager. The parents insisted that the Department knew that they could be contacted through Anthony G.'s mother or Tammy G.'s father and that they made many telephone calls to the Department and to the foster parents that were not returned.

Despite their differing explanations for their lack of communication, both the Department and the parents agree that the only face-to-face meeting Tammy G. and Anthony G. had with their case manager in 2005 occurred on September 9, 2005. At that time, Tammy G. was incarcerated in the Montgomery County Jail, and Anthony G. was incarcerated at the Montgomery County Workhouse. The sole purpose of the meeting was to inform the parents that the Department intended to hold a meeting on September 21, 2005 to revise the children's permanency plan. The case manager actually provided Tammy G. written notice of this meeting[6] but, inexplicably, did not provide similar written notice to Anthony G. The case manager did not offer any services to the parents at this meeting and, at least according to Anthony G., did not tell Anthony G. that the termination of his parental rights would be discussed at the meeting.

Neither Tammy G. nor Anthony G. attended the September 21, 2005 meeting. However, Tammy G.'s father was present. As a result of this meeting, the Department prepared a revised permanency plan for Tiffany B. calling for adoption rather than reunification with her parents.[7] The reasons listed for changing the plan's goal

6. The Department's written notice to Tammy G. stated: "It is very important that you attend this meeting so that your children's permanency [plan] can be revised. Also at this meeting Termination of Parental Rights will be discussed."

7. This plan identified Anthony G. as Tiffany B.'s "legal father."

were "Tiffany['s] parents have not worked their plan and Tiffany has been in custody for almost a year." In this revised plan, the Department agreed to pursue placing Tiffany B. with Tammy G.'s sister who had moved from North Carolina to Ohio.[8] The juvenile court approved the revised permanency plan on October 28, 2005 even though it acknowledged that Anthony G.'s "whereabouts [were] unknown" and that Anthony G. had not been given notice of the revised plan or of the hearing to approve the revised plan.[9]

On December 7, 2005, the Department filed a petition in the juvenile court to terminate Tammy G.'s and Anthony G's parental rights with regard to Tiffany B.[10] The petition alleged three grounds for termination against each parent—abandonment, persistence of conditions, and substantial non-compliance with the terms of the permanency plan—and that terminating Tammy G.'s and Anthony G.'s parental rights would be in Tiffany B.'s best interests.

At a court hearing on January 20, 2006, Tammy G. tested positive for cocaine and marijuana. Anthony G. was not tested but conceded that he would test positive for cocaine and marijuana. In March 2006, Tammy G. entered a six-month residential drug treatment program operated by a church in Bowling Green, Kentucky and eventually found work with a commercial painting contractor. Anthony G. found employment hanging drywall and installing textured ceilings in Clarksville.

The juvenile court conducted hearings on the Department's petition to terminate the parents' parental rights on April 13 and 24, 2006 and on June 5, 2006.[11] The court expressed concern about Anthony G.'s and the Department's failure to agree upon a permanency plan and their failure to discuss the consequences of Anthony G.'s failure to agree to a plan or to accomplish the tasks prescribed for him in the plan. Despite this well-founded concern, the court discredited the testimony of the parents and Tammy G.'s father regarding the Department's and the foster-parents' failure to return their telephone calls and concluded that "DCS made reasonable efforts to serve this family."

In its order filed on July 5, 2006, the trial court concluded that the Department had presented clear and convincing evidence establishing that Tammy G. and Anthony G. had abandoned Tiffany B. by willfully failing to visit her, to support her, or to establish a safe and stable home for her. The court also found that the conditions that had required Tiffany B. to be removed from her parents' custody in October 2004 persisted and that both Tammy

---

8. Notwithstanding its agreement, the Department later decided against placing Tiffany B. with her aunt in Ohio because of the earlier negative report from North Carolina regarding the aunt and because Tiffany B. had a better relationship with her foster parents than she did with her aunt.

9. The juvenile court's October 28, 2005 "permanency hearing order" affirmatively states that David E.'s appointed counsel was representing only David E. The order does not list any lawyer representing Anthony G.

10. Apparently the Department was still unsure about Tiffany G.'s parentage because its petition named not only Anthony G. but also the "Unknown Father of Tiffany B." as a defendant. The petition stated that "Ms. G. has identified Mr. G. as the child's father; however, he is not listed on the child's birth certificate. Mr. G. has not been legitimated as the father of the minor child; therefore the Unknown Father of Tiffany B. is identified as Respondent."

11. The lawyer who had represented David E. since October 11, 2004, represented Anthony G. at the termination hearing. The record contains no information regarding when this appointment was made.

G. and Anthony G. had failed to comply substantially with the requirements of the permanency plans. Therefore, the court determined that terminating both Tammy G.'s and Anthony G.'s parental rights would be in Tiffany B.'s best interests. Both Tammy G. and Anthony G. have appealed.

## II.

### THE STANDARD OF REVIEW

■ A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions.[12] *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2059–60, 147 L.Ed.2d 49 (2000); *In re Adoption of A.M.H.,* 215 S.W.3d 793, 809 (Tenn.2007); *Hawk v. Hawk,* 855 S.W.2d 573, 578–79 (Tenn.1993); *In re Giorgianna H.,* 205 S.W.3d 508, 515 (Tenn.Ct.App.2006). While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. *State Dep't of Children's Servs. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn.Ct.App.2004). It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope,* 77 S.W.3d 137, 141 (Tenn.2002); *In re M.J.B.,* 140 S.W.3d 643, 652–53 (Tenn.Ct. App.2004); *In re S.M.,* 149 S.W.3d 632, 638–39 (Tenn.Ct.App.2004).

Termination proceedings in Tennessee are governed by statute. Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination.[13] Tenn.Code Ann. § 36–1–113(c)(1); *In re F.R.R., III,* 193 S.W.3d 528, 530 (Tenn.2006); *In re D.L.B.,* 118 S.W.3d 360, 367 (Tenn.2003). Second, they must prove that terminating the parent's parental rights is in the child's best interests.[14] Tenn.Code Ann. § 36–1–113(c)(2); *In re Valentine,* 79 S.W.3d 539, 546 (Tenn.2002); *In re H.E.J.,* 124 S.W.3d 110, 113 (Tenn.Ct.App.2003); *In re A.W.,* 114 S.W.3d 541, 545 (Tenn.Ct.App.2003).

■ No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever. Tenn.Code Ann. § 36–1–113(*l*)(1); *M.L.B. v. S.L.J.,* 519 U.S. 102, 119, 117 S.Ct. 555, 565, 136 L.Ed.2d 473 (1996); *In re Knott,* 138 Tenn. 349, 354–55, 197 S.W. 1097, 1098 (1917); *In re Giorgianna H.,* 205 S.W.3d at 515. Because the stakes are so profoundly high, Tenn.Code Ann. § 36–1–113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *State Dep't of Children's Servs. v. A.M.H.,* 198 S.W.3d 757, 761 (Tenn.Ct.App.2006); *In re M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn.Ct. App.1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *In re Marr,* 194 S.W.3d 490, 496 (Tenn.Ct.App.2005), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valen-*

---

12. U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8.

13. The statutory grounds for terminating parental rights are found in Tenn.Code Ann. § 36–1–113(g) (Supp.2006).

14. The factors to be considered in a "best interests" analysis are found in Tenn.Code Ann. § 36–1–113(i).

*tine,* 79 S.W.3d at 546; *In re K.B.H.,* 206 S.W.3d 80, 84 (Tenn.Ct.App.2006); *In re S.M.,* 149 S.W.3d at 639. It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.,* 84 S.W.3d 592, 596 (Tenn.Ct.App.2002); *Ray v. Ray,* 83 S.W.3d 726, 733 (Tenn.Ct.App.2001).

▬ Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson,* 2 S.W.3d 180, 188 (Tenn.1999). Accordingly, Tenn. Code Ann. § 36–1–113(k) explicitly requires courts terminating parental rights to "enter written orders containing specific findings of fact and conclusions of law" whether they have been requested to do so or not. *In re Giorgianna H.,* 205 S.W.3d at 516; *In re M.J.B.,* 140 S.W.3d at 653–54. These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with Tenn.Code Ann. § 36–1–113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.,* 118 S.W.3d at 367; *In re Giorgianna H.,* 205 S.W.3d at 516; *State Dep't of Children's Servs. v. A.M.H.,* 198 S.W.3d at 762.

▬ The "clear and convincing evidence" burden of proof required by Tenn. Code Ann. § 36–1–113(c)(1) requires the reviewing courts to distinguish between the specific facts found by the trial court and the combined weight of those facts. *In re R.M.S.,* 223 S.W.3d 240, 264 (Tenn. Ct.App., 2006); *In re Audrey S.,* 182 S.W.3d 838, 861 n. 26 (Tenn.Ct.App.2005). Accordingly, using the standard of review in Tenn. R.App. P. 13(d), we must first determine whether the facts found by the trial court are supported by a preponderance of the evidence. *In re F.R.R.,* 193 S.W.3d at 530. Then we must determine whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, clearly and convincingly establish all the elements required to terminate a biological parent's parental rights. *In re Giorgianna H.,* 205 S.W.3d at 516; *State Dep't of Children's Servs. v. A.M.H.,* 198 S.W.3d at 762; *State Dep't of Children's Services v. T.M.B.K.,* 197 S.W.3d 282, 288 (Tenn.Ct.App.2006). A trial court's specific findings of fact are entitled to a presumption of correctness under Tenn. R.App. P. 13(d) unless the preponderance of the evidence is otherwise; however, a trial court's conclusion that the Department has presented clear and convincing evidence warranting the termination of a parent's parental rights is not.

## III.

### The Evidence Regarding the Department's Efforts to Reunite the Family

Both Tammy G. and Anthony G. insist that the Department failed to present clear and convincing evidence that it made reasonable efforts to provide them the assistance they needed to regain custody of their children. The Department responds that the evidence supports the juvenile court's conclusion that the Department made reasonable efforts to provide services to the parents and that the parents did not make reasonable efforts to take advantage of the services that were available to them. We have determined that the Department's evidence regarding its efforts to assist Tammy G. and Anthony G. does not establish clearly and convincingly that its case managers' efforts to assist the parents were reasonable or adequate.

### A.

The central importance of the family, in its broadest sense, is ingrained in our cul-

tural and legal heritage. The Tennessee General Assembly wove this principle into the fabric of Tennessee's public policy when it declared that families are among the fundamental building blocks of society and that families are essential to social and economic order and the common good. Tenn.Code Ann. § 36–3–113(a) (2005). Even the statutes empowering the courts to remove children from their parents' custody include within their primary purpose protecting children from "unnecessary separation" from their parents. Tenn.Code Ann. § 37–2–401(a) (2005). Thus, the Tennessee General Assembly has established the policy that children should not be removed from their parents' custody unless the separation is necessary for the child's welfare or is in the interest of public safety, Tenn.Code Ann. § 37–1–101(a)(3) (2005), and that once children are removed, the first priority should be to reunite the family if at all possible. *In re Randall B., Jr.,* No. M2006–00055–COA–R3–PT, 2006 WL 2792158, at *4 (Tenn.Ct. App. Sept.28, 2006) (No Tenn. R.App. P. 11 application filed).

The welfare of children living in a family setting is inextricably linked to their parents' ability to care for them. A parent's inability or disinclination to shoulder his or her parenting responsibilities can have a profound and long-lasting effect on a child. Accordingly, the Tennessee General Assembly has recognized that one of the most effective ways to improve the lives of dependent and neglected children is to improve the ability of their parents to be nurturing caregivers. Improving parenting skills results in better parents and, in turn, happier and more well-adjusted children.

Even when a parent's conduct requires removing a child from the parent's custody, the Tennessee General Assembly has determined that, in most circumstances, the separation should be for only as long as is necessary to preserve, repair, or reunify the family.[15] *See* Tenn.Code Ann. § 37–1–166(g)(2) (2005). Thus, the statutes governing dependent and neglected children and Tennessee's foster care program reflect a preference for preserving families by reuniting parents and children whenever possible.[16] These statutes also reflect an awareness that reunifying parents and children is best accomplished by helping parents address their own challenges and improve their parenting skills.

**B.**

The Department of Children's Services is the state agency with primary responsibility for the care and protection of dependent and neglected children. It plays a direct role in the removal of most dependent and neglected children from their parents' custody, and Tennessee's juvenile courts regularly place these children in the Department's custody. Because of the prominent role that the Department plays in the lives of so many dependent and

---

15. The Tennessee General Assembly has also recognized that some parents' conduct is so inimical to their children's well-being that the family relationship either cannot or should not be repaired or restored. *In re C.M.M.,* M2003–01122–COA–R3–PT, 2004 WL 438326, at *6 n. 19 (Tenn.Ct.App. Mar.9, 2004) (No Tenn. R.App. P. 11 application filed) (identifying the circumstances in which reunification is not required). In these circumstances, and in circumstances in which parents prove unable or unwilling to shoulder their parental responsibilities, the only remaining option is to terminate the parents' parental rights and find a permanent placement that will serve the child's best interests.

16. The Tennessee Supreme Court has also recognized that the courts must protect the parent-child relationship throughout judicial proceedings involving the children. *In re Adoption of A.M.H.,* 215 S.W.3d at 812.

neglected children, the Tennessee General Assembly has explicitly imposed on the Department the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home. Tenn.Code Ann. § 37–1–166.

 The Department must memorialize its efforts in an individualized permanency plan prepared for every dependent and neglected child placed in its custody. The requirements in each permanency plan must be directed toward remedying the conditions that led to the child's removal from his or her parent's custody. *In re Valentine*, 79 S.W.3d at 547; *In re M.J.B.*, 140 S.W.3d at 656–57; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn.Ct.App. 2003). Reflecting the Tennessee General Assembly's understanding that the ability of parents to rehabilitate themselves depends on the Department's assistance and support,[17] permanency plans place obligations on the Department to help parents become better able to provide their children with a safe and stable home and with consistent and appropriate care. *In re C.S., Jr.*, No. M2005–02499–COA–R3–PT, 2006 WL 2644371, at *9 (Tenn.Ct.App. Sept.14, 2006) (No Tenn. R.App. P. 11 application filed).

 While the Department's efforts to assist parents need not be "herculean,"[18] the Department must do more than simply provide the parents with a list of service providers and then leave the parents to obtain services on their own. *In re*

*Giorgianna H.*, 205 S.W.3d. at 519; *In re C.M.M.*, 2004 WL 438326, at *7. The Department's employees must bring their education and training to bear to assist the parents in a reasonable way to address the conditions that required removing their children from their custody and to complete the tasks imposed on them in the permanency plan. *In re Giorgianna H.*, 205 S.W.3d. at 519; *In re J.L.E.*, No. M2004–02133–COA–R3–PT, 2005 WL 1541862, at *14 (Tenn.Ct.App. June 30, 2005) (No Tenn. R.App. P. 11 application filed); *In re D.D.V.*, No. M2001–02282–COA–R3–JV, 2002 WL 225891, at *8 (Tenn.Ct.App. Feb.14, 2002) (No Tenn. R.App. P. 11 application filed). The Department cannot use budgetary concerns to justify its failure to make reasonable efforts to reunify parents and their children. *In re Randall B., Jr.*, 2006 WL 2792158, at *5.

 The Department's efforts to reunify parents and their children will be deemed reasonable if the Department has exercised "reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family." Tenn.Code Ann. § 37–1–166(g)(1). The reasonableness of the Department's efforts depends upon the circumstances of the particular case. In cases like this one, the factors that courts use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the par-

---

**17.** *In re State Dep't of Children's Services v. Howard*, No. W2006–00585–COA–R3–PT, 2006 WL 2257341, at *5 (Tenn.Ct.App. Aug.8, 2006) (No Tenn. R.App. P. 11 application filed); *In re Giorgianna H.*, 205 S.W.3d at 518; *In re C.M.M.*, 2004 WL 438326, at *7; *State v. Demarr*, No. M2002–02603–COA–R3–JV, 2003 WL 21946726, at *10 (Tenn.Ct.App. Aug.13, 2003) (No Tenn. R.App. P. 11 application filed).

**18.** *In re K.E.R.*, No. M2006–000255–COA–R3–PT, 2006 WL 2252746, at *5 (Tenn.Ct.App. Aug.3, 2006) (No Tenn. R.App. P. 11 application filed); *State v. Malone*, No. 03A01–9706–JV–00224, 1998 WL 46461, at *2 (Tenn.Ct.App. Feb.5, 1998), *perm. app. denied* (Tenn. June 8, 1998).

ents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.[19] *In re Giorgianna H.*, 205 S.W.3d. at 519.

 Reunification of a family, however, is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents. *In re C.S., Jr.*, 2006 WL 2644371, at *9; *State Dep't of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn.Ct.App.2006); *In re R.C.V.*, No. M2001–02102–COA–R3–JV, 2002 WL 31730899, at *12 (Tenn.Ct.App. Nov.18, 2002) (No Tenn. R.App. P. 11 application filed). Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody. They must also make reasonable efforts to rehabilitate themselves once services have been made available to them. *In re Randall B., Jr.*, 2006 WL 2792158, at *6; *In re Giorgianna H.*, 205 S.W.3d. at 519; *State Dep't of Children's Servs. v. B.B.M.*, No. E2004–00491–COA–R3–PT, 2004 WL 2607769, at *7 (Tenn.Ct.Ap. Nov. 17, 2004) (No Tenn. R.App. P. 11 application filed); *In re C.M.M.*, 2004 WL 438326, at *7.

## C.

 Other than the evidence surrounding the preparation of the October 11, 2004 permanency plan, the record contains surprisingly little detail regarding the Department's efforts to locate or assist Tammy G. and Anthony G. between October 6, 2004 when the Department took custody of the children and May 2005 when the third case manager was assigned to the case. In fact, the Department presented no evidence regarding the efforts of the first two case managers to locate and assist the parents.

There is more evidence regarding the Department's dealings with Tammy G. after May 2005. Tammy G.'s third case manager had a telephone conversation with her in June 2005 and talked with her face-to-face in September 2005 when she was incarcerated. Her case manager also maintained some contact with Tammy G.'s father. However, the case manager conceded that she never attempted to communicate with Tammy G. in writing and that she never had any follow-up conversations with Tammy G. about helping her obtain rehabilitative services. In fact, the case manager conceded that she had decided by late September 2005 that Tammy G.'s parental rights should be terminated to facilitate the adoption of Tiffany B.

The evidence regarding the Department's efforts to assist Anthony G. even caused the juvenile court to express concern. The Department made no effort to communicate with him in writing, and his third case manager admitted that she had only one face-to-face meeting with Anthony G., which occurred in September 2005 when he was incarcerated in the workhouse. On this occasion, the case manager admitted that she failed to provide Anthony G. with the written notice of the September 21, 2005 meeting that she had provided Tammy G. earlier that same day and

---

19. Directing reunification efforts toward matters of little consequence is not reasonable.

*In re Giorgianna H.*, 205 S.W.3d at 519 n. 24.

that she did not offer to make arrangements to provide him services at that time.

At trial, the Department attempted to lay the responsibility for the parents' lack of remedial progress entirely on the parents themselves. Notwithstanding the undisputed fact that both parents were incarcerated a great deal of the time between October 2004 and December 2005, the case manager insisted that she had been unable to locate or help the parents because they did not contact her and because they were "on the run." [20] While the case manager testified repeatedly that the parents did not telephone her, she failed to provide much detail about her efforts to locate the parents other than her testimony that she had several telephone conversations with Anthony G.'s mother and with Tammy G.'s father.

When the record in this case is considered in its entirely, it leaves a distinct impression that the Department did not expend much effort either to locate or to assist either Tammy G. or Anthony G. after it obtained custody of Tiffany B. Despite its knowledge that the parents were addicted to crack cocaine, homeless, unemployed, and facing criminal charges, the Department apparently expected the parents to initiate the remedial efforts on their own and to ask their case manager for help. This expectation was unreasonable. In circumstances that do not involve serious physical abuse or harm to the child, the law does not permit the Department to be passive when it removes children from their parents' custody. The law requires the Department to bring its skills, experience, and resources to bear in a reasonable way to bring about the reunification of the family. The Department has not presented clear and convincing evidence that it did so in this case. Therefore, we have no choice other than to vacate the order terminating the parents parental rights and remand the case for further proceedings. [21]

## IV.

We vacate the judgment terminating the parents' parental rights and remand the case to the juvenile court for further proceedings consistent with this opinion. We tax the costs of this appeal to the Tennessee Department of Children's Services.

---

**20.** The case manager chose the phrase "on the run" to create an impression that Tammy G. and Anthony G. were purposely making themselves difficult to find. The record does not support this impression. Like many persons who have no funds, Tammy G. and Anthony G. had no fixed residence and had no regular access to a telephone. They lived where they could. Anthony G. testified that he told the case manager that they were "on the go" because they were trying to find work and places to stay.

**21.** The Department may very well have expended more time and effort attempting to contact and assist Tammy G. and Anthony G. than this record shows. Our remand order is broad enough to permit the Department, should it desire to do so, to present more specific evidence regarding the efforts of all its employees between October 6, 2004 and December 7, 2005 to contact the parents, to provide remedial assistance to the parents, to notify the parents of their rights and responsibilities, and to explain to the parents the consequences of their failure to address the issues that originally caused the children to be removed from their custody. If the Department presents additional evidence regarding its efforts to contact and assist the parents, our disposition of this appeal does not prevent the juvenile court from concluding that the Department exercised reasonable care and diligence to provide services related to meeting the needs of the child and the family.